IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NICOLE GROSS-JONES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 11-0132-WS-M |
| | ) | |
| MERCY MEDICAL, etc., | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 58). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 58, 60, 62-65, 73-75, 82-84), and the motion is ripe for resolution. After carefully considering the foregoing, the Court concludes that the motion for summary judgment is due to be granted in part and denied in part.

## BACKGROUND

The plaintiff was employed by the defendant healthcare provider in its recreational therapy department until she was terminated in April 2011. Count One of her amended complaint alleges that the plaintiff was sexually harassed and retaliated against in violation of Title VII. Count Two alleges that she was retaliated against in violation of the FMLA. (Doc. 22).

The plaintiff worked with and eventually under Lisa Griggs in the recreational therapy department. Over them was chief nursing officer Carrie Roberts. Brian McFeely was facility administrator beginning in October 2010, and Randy Harrison was human resources vice-president at all relevant times.

[1]

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.* "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to

make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[1]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I.  Title VII – Sexual Harassment.

The plaintiff is a heterosexual female.  The amended complaint alleges that Griggs, a homosexual female, subjected the plaintiff to acts of sexual harassment.  The evidence, viewed most favorably to the plaintiff, is that Griggs:  touched the plaintiff's arm with her breast (one time); stared at the plaintiff (one time); told the plaintiff she looked pretty (several times); invited the plaintiff to go camping (twice); tried to invite herself to the plaintiff's house (four or five times); asked the plaintiff to dinner (several

_____

[1] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

[3]

times); and asked the plaintiff to lunch (several times).  Griggs also invaded the plaintiff's personal space and asked to accompany the plaintiff to Atlanta (to watch the plaintiff's brother play college basketball), each on multiple but unquantified occasions. (Jones I Deposition at 189-93, 199, 201-02, 205-06; Jones II Deposition at 94-100; Defendant's Exhibit 23 at 13).[2]

The defendant advances a number of challenges to this claim:  (1) failure to file a timely charge; (2) failure to assert sexual harassment in her charge; (3) absence of severe or pervasive sexual harassment; and (4) absence of any basis for employer liability.

### A. Timeliness of the Charge.

"A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ...."  42 U.S.C. § 2000e-5(e)(1). "A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed.  ... [I]t is merely an unfortunate event in history which has no present legal consequences."  *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977).  Failure to file a timely charge entitles the defendant to summary judgment.  *E.g., Armstrong v. Martin Marietta Corp*., 138 F.3d 1374, 1394 (11th Cir. 1998); *accord Wilson v. Bailey*, 934 F.2d 301, 304 n.1 (11th Cir. 1991) ("Failure to file a timely complaint with the EEOC mandates the dismissal of the

---

[2] The plaintiff's brief includes references to sexual harassment by her co-workers, consisting primarily of teasing over Griggs' attentions.  (Doc. 73 at 3-4, 29, 32-33).  The plaintiff testified to such conduct in her depositions, but Count One of the amended complaint explicitly limits her claim to "sexual harassment of the plaintiff *by her supervisor*."  (Doc. 22 at 8, ¶ 43 (emphasis added)).  The antecedent factual allegations of the amended complaint similarly allege sexual harassment only "by Griggs."  (*Id*. at 4, ¶¶ 15, 16, 19).  Because the plaintiff did not preserve in her amended complaint any claim of sexual harassment by co-workers, and because the defendant objects to her expanding her claim at this juncture, (Doc. 83 at 2-3, 8), alleged sexual harassment by the plaintiff's co-workers is not part of this case.  *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Title VII suit."). To evaluate the defendant's argument that this claim is barred by the limitations period, the Court must identify the relevant dates.

The defendant initially argued that the plaintiff's first EEOC charge was filed November 19, 2010. (Doc. 64 at 23). In fact, however, the document to which the defendant cited is the EEOC's notice of charge, (Defendant's Exhibit 54), not the charge itself. The plaintiff notes that she filed an intake questionnaire on November 3, 2010. (Doc. 73 at 29; Defendant's Exhibit 68). An intake questionnaire can satisfy the charge requirement, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1321 (11th Cir. 2001), and the defendant does not argue that the plaintiff's intake questionnaire fails to satisfy the *Wilkerson* test. On the contrary, the defendant in its reply brief concedes that the plaintiff "filed the November charge on November 3, 2010." (Doc. 83 at 6). November 3, 2010 is thus the concluding date of the 180-day filing period. The opening day of the filing period is thus May 7, 2010.

In the sexual harassment context, "[i]n order for the charge to be timely, the employee need only file a charge within 180 … days of any act that is part of the hostile work environment." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002).[3] The question becomes whether any act that is part of the alleged hostile work environment occurred on or after May 7, 2010.

In early April 2010, the plaintiff passed on to management a complaint voiced against Griggs by two student interns, including Joann Lawrence. (Jones I Deposition at 200). On that day or the next, Griggs (still ignorant of the complaint) accosted the plaintiff in an elevator because the interns were coming to the plaintiff for assistance rather than to Griggs. (*Id.* at 193, 196, 200-01). During this encounter, Griggs backed the plaintiff against the elevator wall, came so close to the plaintiff that her breasts

─────────────────

[3] *Morgan* was a racial harassment case, but "[h]ostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." 536 U.S. at 116 n.10.

touched the plaintiff's arm, and "got all up on me and put her legs apart and put her hand like she was crouching a penis between her legs." (*Id*. at 192-93). This is the only time Griggs ever touched the plaintiff. (*Id*. at 199-201, 205; Jones II Deposition at 98).

On April 13, 2010, management met with Griggs concerning the interns' complaint and advised her that the plaintiff had brought the complaint to management's attention. (Defendant's Exhibit 6). Griggs then stormed into the office while the plaintiff sat at the computer desk and angrily told her she should have come to Griggs with the complaint and that it was "too bad" for the plaintiff that she had gone to management instead. (Jones I Deposition at 199, 201-02). The plaintiff confirmed that this incident occurred within "days" of her early April report to management of the interns' complaint. (*Id*. at 207, 209).

The defendant identifies the computer desk incident as the final episode on which the plaintiff bases her claim of sexual harassment. (Doc. 64 at 20, 24). If true, the plaintiff's claim is time-barred. The record, however, does not support the defendant's position. As noted, the plaintiff has asserted that Griggs sexually harassed her by invading her personal space. (Doc. 22 at 4, ¶ 15; Doc. 73 at 3). As the plaintiff notes, (*id*. at 11-12, 29-30), one such incident occurred on August 19, 2010. On that date, Griggs came in the office and "got into my face too close." (Jones II Deposition at 100-01). Because this incident "is part of the hostile work environment," the plaintiff's sexual harassment claim is timely in its entirety.

The defendant offers two rejoinders to the plaintiff's position. First, the defendant objects that the plaintiff in brief "conflated" the April and August incidents. (Doc. 83 at 7). And so she did,[4] but that is beside the point. The question is whether the plaintiff has identified an act of alleged sexual harassment that occurred after May 6, 2010, and in

---

[4] The plaintiff cited testimony about these two incidents as if they were a single incident. (Doc. 73 at 11-12, 29-30).

response to that question the plaintiff directed the Court to the August 19 incident, which included an alleged invasion of the plaintiff's personal space.

Second, the defendant insists that the plaintiff admitted in deposition that "*all* the alleged 'sexually harassing' behavior by Griggs stopped" in April 2010.  (Doc. 64 at 20 (emphasis in original); *accord* Doc. 83 at 7).  But she simply did not do so.  On the deposition pages cited by the defendant, the plaintiff addressed only Griggs' attempts to be invited to Atlanta and to the plaintiff's home.  (Jones II Deposition at 96-98).  Nothing in this testimony rules out instances of Griggs invading the plaintiff's personal space after May 6, 2010.

For the reasons set forth above, the defendant is not entitled  to dismissal of the sexual harassment claim on the grounds of untimeliness.[5]

### B.  Scope of the Charge.

"[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Gregory v. Department of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotes omitted).  Resolution of this issue requires an examination of the documents the plaintiff placed before the EEOC.

As noted, the plaintiff completed an intake questionnaire in early November 2010. (Defendant's Exhibit 68).  The plaintiff checked only the boxes for "religion" and "retaliation," not "sex."  (*Id*. at 2).[6]  This document mentions none of the conduct on which the plaintiff bases her sexual harassment claim and mentions the term only in

---

[5] The plaintiff filed a second charge on or about June 30, 2011.  (Defendant's Exhibit 13). Because the most recent incident of sexual harassment on which the plaintiff relies occurred in August 2010, this charge is untimely as to her sexual harassment claim.  Therefore, the discussion in Parts I.B addresses only the November 2010 charge.

[6] The parties' statements to the contrary, (Doc. 64 at 24; Doc. 73 at 30), are incorrect.

describing the interns' complaint.  (*Id.* at 2-3).  Appropriately, the plaintiff does not contend that the intake questionnaire satisfies *Gregory*.  (Doc. 73 at 30-31).

However, the plaintiff notes that, along with the intake questionnaire, she submitted to the EEOC a copy of the 18-page handwritten complaint she presented to the defendant on or about November 2, 2010.  (Doc. 73 at 30).  That document contains the following paragraphs:

> – Lisa has been handle me in this manner since she was made department manager, but before that she has been inviting to go camping with here in Tennesse on her land, and she has tried to invite herself to my house on more 3 occasions, she has tried to invite me out for a meal with her away from the company, and I stopped making up my face because she would always tell me how pretty I look when I would put on makeup.   She made me very uncomfortable.
>  – She was always getting up to close and personal with me, so I started avoiding being in the office with her right after the company laid Jody off.  Jody Ward knows that Lisa invited me to go camping with her.

(Defendant's Exhibit 23 at 13-14).

These paragraphs incorporate most of the conduct the plaintiff alleges herein to be sexually harassing, a proposition the defendant does not deny.  Nor does the defendant assert that the plaintiff did not in fact submit this document to the EEOC.  Instead, the defendant objects that the quoted language:  (1) is buried in the midst of a document focused on retaliation; and (2) does not describe the conduct as sexually harassing but only as making the plaintiff feel uncomfortable.  (Doc. 83 at 4).  The defendant offers no argument or authority in support of its position but instead chides the plaintiff for presenting no authority of its own confirming the adequacy of her submission to the EEOC.  On motion for summary judgment, however, it is the responsibility of the movant to show that the plaintiff's submission does not meet the *Gregory* standard; it is not the responsibility of the plaintiff to show that it does.  The defendant's personal skepticism does not meet its burden.

[8]

At any rate, *Gregory* itself casts doubt on the defendant's position.  "The proper inquiry here therefore is whether [the plaintiff's] complaint was like or related to, or grew out of, the allegations contained in her EEOC charge."  355 F.3d at 1280.  This standard is met if the plaintiff "stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation."  *Id.*  The *Gregory* Court found this standard satisfied even though the plaintiff did not use the term "retaliation" or check that box.  So here, the plaintiff's statements to the EEOC that a female superior made her uncomfortable by calling her "pretty," asking her out for meals and trips, and trying to get herself invited to the plaintiff's house would allow a reasonable EEOC investigator to conclude that the plaintiff was including a complaint of sexual harassment.  If there were any doubt on the matter, it would be laid to rest by the finished charge, which checked the box for "sex" as well as for "retaliation" and "religion."  (Defendant's Exhibit 55 at 2).

But, the defendant suggests, a reasonable EEOC investigator would never have taken the time to read the 18-page attachment and thereby discover the allegations of sexual harassment or else would have missed it for all the surrounding allegations of retaliation.  The Court has been offered no reason to assume that reasonable EEOC investigators do not perform their job duties, and the Court will not indulge any such unsupported assumption.[7]

Finally, the defendant objects that the EEOC did not in fact investigate any claim of sexual harassment.  (Doc. 83 at 4).  This argument was not raised in the defendant's

---

[7] The defendant does not argue that only information contained in the charge or intake questionnaire document itself, exclusive of information included in any attachment thereto, can be considered in determining the scope of the charge.  Any such argument would appear questionable at best.  *See, e.g., Fantini v. Salem State College*, 557 F.3d 22, 27-28 (1st Cir. 2009) (relying on information in an attachment to reject a scope-of-the-charge argument); *Dixon v. Ashcroft*, 392 F.3d 212, 216, 218 (6th Cir. 2004) (same); *Cheek v. Western and Southern Life Insurance Co.*, 31 F.3d 497, 502 (7th Cir. 1994) ("Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations.").

principal brief and thus comes too late.[8]  The EEOC's actual investigation is in any event irrelevant, as it is the reasonably expected scope of the EEOC's investigation, not the narrower scope of its actual investigation, that governs.  *E.g., Gregory*, 355 F.3d at 1280.

For the reasons set forth above, the defendant is not entitled  to dismissal of the sexual harassment claim on the grounds it exceeds the scope of the charge.

### C.  Severe or Pervasive Harassment.

The fourth element of a claim for sexual harassment is that "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).  The defendant argues that the plaintiff cannot satisfy this test.

Not every unpleasantness experienced in the workplace goes into the calculation of whether the harassment was severe or pervasive.  Importantly, "the statements and conduct must be of a sexual or gender-related nature ... before they are considered in determining whether the severe or pervasive requirement is met."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).  Thus, "[i]nnocuous statements or

---

[8] District courts, including this one, ordinarily do not consider arguments raised for the first time on reply.  *See Park City Water Authority v. North Fork Apartments, L .P.*, 2009 WL 4898354 at *1 n.2 (S.D. Ala. 2009) (citing cases from over 40 districts applying the rule in 2009 alone).  The Eleventh Circuit follows a similar rule.  *E.g., Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted).

The Court has identified some of the reasons supporting the rule.  "In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief."  *Hardy v. Jim Walter Homes, Inc*., 2008 WL 906455 at *8 (S.D. Ala. 2008).

conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted" in determining the severity or pervasiveness of the harassment.  *Id.*

The defendant argues that the elevator and computer desk incidents of April 2010 must be excluded under this principle because "neither incident was at all sexual."  (Doc. 64 at 26).  But in the former incident, Griggs touched the plaintiff's arm with her breasts and  "got all up on me and put her legs apart and put her hand like she was crouching a penis between her legs," conduct that sounds at least vaguely sexual.  In the latter incident, Griggs approached the plaintiff as she sat in a chair, came "almost between my legs," and "put her arms down and g[o]t that close in my face," (Jones I Deposition at 199), conduct that could be construed as sexual.  It is true that, as the plaintiff described these incidents, Griggs was angry or even "furious," (*id.* at 202), but anger and sexual attraction are not mutually exclusive, and the former has even been known to stoke the latter.  The defendant's cursory treatment of the issue is inadequate to demonstrate that these incidents cannot be considered as part of the allegedly hostile working environment.

For her part, the plaintiff repeatedly insists she can rely on sexual harassment she experienced at the hands of her co-workers.  (Doc. 73 at 32, 33, 34).  As discussed in note 2, *supra*, the amended complaint limits the plaintiff's claim to sexual harassment by Griggs, to the exclusion of harassment by co-workers.  Any such harassment by co-workers is irrelevant to the plaintiff's claim and the Court's analysis.

The plaintiff also seeks to include evidence of sexual harassment by Griggs against intern Lawrence in the assessment of whether the sexual harassment was severe or pervasive.  (Doc. 73 at 34).  This is a closer case.  In order to rely on such conduct, the plaintiff at a minimum must produce evidence that she witnessed the conduct or was made aware of it before her termination.  *Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir. 1995).  The defendant says there is no evidence that the plaintiff was aware of any of this conduct before Lawrence's deposition in this litigation, (Doc. 83 at

[11]

9), but this is overstatement. Although the plaintiff witnessed no sexual harassment of Lawrence, she did receive a verbal report from Lawrence that Griggs had recently gotten in Lawrence's face, approaching Lawrence so closely that their breasts touched. (Jones I Deposition at 210, 212, 215). The Court will therefore consider this incident in its evaluation.[9]

"Determining whether the harassment was sufficiently severe or pervasive involves both an objective and a subjective component. [citation omitted] In determining the objective element, a court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (internal quotes omitted).[10]

---

[9] The Court agrees that the plaintiff has presented no evidence she was aware of any other potential harassment of Lawrence by Griggs during the relevant time. Her written statement to management mentions that Griggs "touch[ed] her when she asked her not to, and pu[t] her fingers in her face (motioning)," (Jones I Deposition, Exhibit 22), but the plaintiff testified that this represents the same incident stated more graphically in text. (Jones I Deposition at 212, 215). The plaintiff testified that Lawrence "told me about other incidents," (*id.* at 211), but she offers no evidence of what she was told, precluding consideration of such other incidents.

[10] The defendant believes the plaintiff in deposition negated the subjective prong of this element as to all conduct preceding the elevator incident in April 2010. (Doc. 64 at 26). But when the plaintiff stated that Griggs to that point "never touched me or did nothing that really crossed the line," she was explaining only why she had not complained to management previously. (Jones I Deposition at 191). In that context, her testimony can – and therefore, on motion for summary judgment, must – be construed as a statement that she felt non-physical harassment should not or could not be reported to management, not as an admission that she subjectively did not consider the conduct to be harassing. This is especially so given the plaintiff's contemporaneous testimony that she "never felt comfortable around Lisa" because of her conduct and that she had begun avoiding Griggs even before the interns arrived in January 2010. (*Id.* at 186-87, 189; Lawrence Deposition at 8). Since the defendant's only attack on the subjective prong thus fails, the Court focuses in text on the objective prong.

[12]

### 1. Frequency.

The plaintiff was hired in April 2008.  (Defendant's Exhibit 1).  When the plaintiff was "still freshly new," Griggs first asked her to go camping.  (Jones I Deposition at 189-90).  With all sexual harassment other than invading personal space ending in April 2010, this means the bulk of the alleged harassment occurred over a span of two years.  (Jones II Deposition at 95-96).  Spread over that expanse of time, the frequency of the conduct is not high.

As noted, over that period Griggs touched the plaintiff one time, stared at her one time, invited her to go camping two times, and tried to invite herself to the plaintiff's house four or five times, for a total of seven or eight incidents in 24 months.  There was as well the single incident involving Lawrence.  In addition, Griggs told the plaintiff she was pretty several times, asked her to lunch several times, and asked her to dinner several times.  Finally Griggs asked to accompany the plaintiff to Atlanta and got "too close and personal" on an unspecified number of occasions.  Although the plaintiff's imprecision precludes a mathematical calculation, it is clear that the frequency of incidents through April 2010 did not exceed one incident per month on average.

The plaintiff testified that only the invasions of her personal space continued after the elevator incident in April 2010.  (Jones I Deposition at 199, 205).  The only two subsequent incidents she identified were the computer desk incident and the August 19 incident.  There is thus no indication that these incidents occurred more frequently than the other types of allegedly sexually harassing behavior, or approximately once a month on average.

The Eleventh Circuit considers an incident a week to be sufficiently frequent to bolster a plaintiff's case but considers an incident every two months to be insufficiently frequent to do so.  *Compare Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (fifteen instances in four months "was not infrequent") *with Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1249 (11th Cir. 1999) (en banc) (five inappropriate instances in eleven months were "far too infrequent" to support

a sexual harassment claim) *and Gupta*, 212 F.3d at 579, 584-85 (eight episodes of touching, partial exposure, staring and complimenting in six or seven months, plus repeated invitations to lunch during the same period, was not frequent).  Since the frequency in *Gupta* exceeded one incident a month, the frequency of Griggs' conduct does not support the plaintiff's claim.

### 2.  Severity.

As a matter of law, complimenting a plaintiff's appearance does not contribute to a sexually harassing atmosphere; this is mere flirtation, and "flirtation is not sexual harassment."  *Gupta*, 212 F.3d at 584.  Likewise, staring at a plaintiff twice or repeatedly asking her to lunch is not severe.  *Id*. at 585.

The plaintiff characterizes Griggs' invitations to go camping, to basketball games or to dinner as requests for "dates."  (Doc. 73 at 33).  Asking an employee for a date, even repeatedly, is not severe conduct.  *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993), *discussed in Mendoza,* 195 F.3d at 1247; *Mandel v. M&Q Packaging Corp.*, 2011 WL 3031264 at *10 (M.D. Pa. 2011).  This is especially so when, as here, the plaintiff merely declines the invitations (often by making excuses) without instructing the harasser to stop asking her. (Jones I Deposition at 187, 191; Jones II Deposition at 95, 97).

That Griggs tried to get herself invited to come to the plaintiff's house does not even rise to the level of a request for a date, especially since Griggs knew the plaintiff was married with children and made her requests when she realized that family or other persons would be at the plaintiff's residence.  (Jones I Deposition at 187-88, 190-91).[11]  It therefore cannot be severe conduct.  *See Gupta*, 212 F.3d at 578, 584-86 (defendant's

---

[11] When the plaintiff's husband killed a wild pig, Griggs wanted to come over and "have some hog with us."  (Jones I Deposition at 187).  "[I]f I had other co-workers over she would want to come to my house."  (*Id*. at 188).  Griggs "wanted to come to my house for functions and things that I would have."  (*Id*. at 190).

offer to drop off Jamaican meal by the plaintiff's house did not contribute to a hostile work environment).

As noted, the elevator incident represents the only time Griggs touched the plaintiff in any fashion.  On a ride between one floor and the next, Griggs expressed her dissatisfaction that the interns came to the plaintiff for assistance.  The plaintiff pointed out that, because she and the interns arrived each morning well before Griggs, the interns had to come to her rather than to Griggs during the interim.  Upon hearing this, Griggs came closer to the plaintiff, who backed up to the elevator wall.  Griggs advanced close enough to the plaintiff that her breasts "touched up on" the plaintiff's arm, and Griggs insisted that she was the interns' boss and that they and the plaintiff had to do as Griggs said.  As she said this, Griggs "put her legs apart and put her hand like she was crouching a penis between her legs."  When the elevator door opened on the next floor, Griggs stood back and the plaintiff departed.  (Jones I Deposition at 192-93, 196).

The length of this entire incident is measured in seconds.  Griggs did not grope the plaintiff, rub against her or kiss her, and the plaintiff makes no effort to construe her odd description of Griggs' stance as a veiled demand for sexual services.[12]  The encounter consisted at most of a fleeting, slight physical contact and an ambiguous stance.  The incident involving Lawrence was similarly limited to brief contact between Griggs' breasts and Lawrence while lecturing or berating her.[13]  As a matter of law, such conduct is not severe.  *Gupta*, 212 F.3d at 585 (two incidents, involving touching the plaintiff's thigh and lifting the hem of her dress, which were momentary and unaccompanied by any verbal suggestions or advances, were not severe); *Mendoza*, 195 F.3d at 1247, 1249 (an

---

[12] This may be because the plaintiff also described Griggs' stance as merely standing "with her legs apart and her hands cupped between her legs," (Defendant's Exhibit 23 at 12), a description carrying no discernible sexual connotation.

[13] That Griggs was putting her fingers in Lawrence's face, *see* note 9, *supra*, makes this clear.

[15]

incident in which the alleged harasser "rubbed his hip against [the plaintiff's] hip while touching her shoulder and smiling" was not severe).[14]

The only conduct remaining for consideration is Griggs' invasions of the plaintiff's personal space. The plaintiff did not explain what it means for Griggs to have gotten "too close and personal," but she admits that, prior to April 2010, it did not include getting into her face. (Jones I Deposition at 199, 205; Jones II Deposition at 102; Defendant's Exhibit 23 at 13). Invading an employee's personal space generally is not severe conduct. *See Gupta*, 212 F.3d at 585 (touching the plaintiff's bracelet and ring is not severe conduct).[15] There is nothing in the plaintiff's description of these incidents that could take them outside the general rule.

There are only two known instances of Griggs invading the plaintiff's personal space after the elevator incident. In April, the plaintiff was seated at the computer desk by the office door when Griggs entered and shut the door. She came into the plaintiff's "chair space, like almost between my legs." Griggs, who was "furious" at the plaintiff for taking Lawrence's complaint to management, then "put her arms down" and "got in my face, down at my chair, too close" as she exploded at the plaintiff. (Jones I Deposition at 199, 201-02). On August 19, Griggs again "got up into my face," but with the plaintiff's desk between them. (Jones II Deposition at 100-02, 106-07). As with the elevator and computer desk incidents, Griggs' purpose was not titillation but "like, you

_____

[14] The *Mendoza* Court cited with approval a number of appellate cases in which conduct including touching was deemed insufficient to support a sexual harassment claim. 195 F.3d at 1246-47 (citing cases in which the alleged harasser: touched the plaintiff's arm; touched the plaintiff's breasts with some papers he was holding; touched the plaintiff's arm, fingers or buttocks four times; put his arm around the plaintiff; bumped into the plaintiff; and put his hand on the plaintiff's shoulder at least six times).

[15] *Accord Alagna v. Smithville R-II School District*, 324 F.3d 975, 978, 980 (8th Cir. 2003); *Emery v. Brown-Forman Corp.*, 1994 WL 456806 at *3 (6th Cir. 1994); *Toth v. California University*, 2012 WL 45418 at *16 (W.D. Pa. 2012); *Hubbard v. Bimbo Bakeries USA, Inc.*, 2006 WL 2863222 at *12 (D. Ore. 2006); *Taylor v. State*, 2000 WL 44996 at *2, 4 (N.D. Ill. 2000).

[16]

know, you are going to listen to what I have got to say and I am going to tell you this." (Jones I Deposition at 205). Griggs' conduct on these two occasions obviously was unprofessional, but it cannot be considered severe, especially given that she did not touch the plaintiff and that her motivation, whatever minor sexual taint it might possess, was to express displeasure, not arousal.

### 3. Quality.

Staring at a subordinate twice is not threatening or intimidating. *Gupta*, 212 F.3d at 585. Nor is repeatedly asking a subordinate to lunch. *Id*. The same is necessarily so with respect to Griggs' other efforts to socialize with the plaintiff and with respect to her compliments of the plaintiff's appearance. The two episodes of incidental contact with Griggs' breasts likewise are not threatening or intimidating. *Mendoza*, 195 F.3d at 1248-49 (the alleged harasser's rubbing of his hip against the plaintiff's hip while touching her shoulder and smiling was not threatening or humiliating). Nor are the pre-April 2010 instances of invading the plaintiff's personal space. *Gupta*, 212 F.3d at 585 (touching the plaintiff's ring and bracelet was not threatening or humiliating).

On four occasions, Griggs got in the face of the plaintiff or Lawrence for the purpose of arguing with them. It is plausible that getting into another's face could objectively be viewed as intimidating or threatening,[16] but Griggs' facially non-sexual motivation drains the incidents of significance.

### 4. Interference.

This factor "involves both a subjective and objective inquiry." *Gupta*, 212 F.3d at 586. To meet the subjective prong, the plaintiff states that she took steps to avoid Griggs, that she was humiliated by Griggs' conduct, and that the harassment resulted in increased

---

[16] *See Mendoza*, 195 F.3d at 1249 (suggesting that constantly following closely behind an employee could be intimidating or threatening).

hypertension.  (Doc. 73 at 34).  These assertions, and the evidence on which the plaintiff relies to support them, do not create a genuine issue of fact as to the subjective prong.

The plaintiff cites no evidence that she felt humiliated, only that she felt "uncomfortable."  (Jones I Deposition at 189, 199; Jones II Deposition at 96, 99; Defendant's Exhibit 23 at 13).  Her only evidence of increased hypertension is from 2011, long after the last incident of Griggs getting in her face in August 2010, and at a time she had just been suspended for "ridiculous" reasons, was divorcing her husband, was being "harassed" by him, and was being subjected to vulgar jokes and sexual comments by her co-workers on a nearly daily basis.  (Hall Deposition at 28-31; Jones Declaration at 2).  Absolutely nothing ties the plaintiff's increased hypertension to Griggs' alleged sexual harassment.  The plaintiff does cite evidence that she stayed away from the office to avoid Griggs.  (Jones I Deposition at 186; Jones II Deposition at 98).  She does not, however, cite evidence that this alteration in her schedule interfered with her work performance.  On the contrary, she states only that she left the office for her lunch break and to work on the units.  (*Id*.).

As to the objective prong of the inquiry, the plaintiff does not argue that Griggs' conduct would cause a reasonable person to experience more difficulty doing the job; instead, she argues that the comments of her co-workers would do so.  (*Id*.).  As noted, however, co-worker sexual harassment is not part of the plaintiff's case.  Properly confining the analysis to Griggs' behavior, *Gupta* and its similar facts make plain that "the conduct and statements in question would not have interfered with a reasonable employee's performance of her job."  212 F.3d at 586.

### 5.  Totality of the Circumstances.

The plaintiff's evidence ranks low on the frequency scale.  Except for the three episodes beginning with the elevator incident, her evidence ranks extremely low on the severity scale and extremely low on the threatening/intimidating scale.  Even those three incidents rank low on these scales.  Finally, these infrequent and mild incidents would not

[18]

have caused a reasonable person to have difficulty doing her job and did not cause the plaintiff to experience such difficulty.  This is not a recipe for a successful sexual harassment claim.

In *Gupta*, the harasser, on separate occasions over the course of six or seven months:  (1) told the plaintiff she looked beautiful; (2) stared at her legs; (3) stared at her as she removed her jacket; (4) touched her bracelet; (5) touched her ring; (6) put his hand on her thigh; (7) lifted the hem of her dress about four inches; (8) unbuckled his belt and pulled down his zipper in front of her in order to tuck in his shirt; (9) volunteered to bring a meal by her house; (10) told her he could tell she did not have much experience in sexual matters; (11) told her he would have spent the night with her (during a storm) had she asked; (12) repeatedly asked her to lunch; and (13) frequently called her at home late at night and asked personal questions.  212 F.3d at 578-79, 584-86.  The Eleventh Circuit held this was insufficient evidence to support a jury verdict in the plaintiff's favor, that the conduct "exemplifies the ordinary tribulations of the workplace," and that upholding liability "would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would trivialize true instances of sexual harassment."  *Id*. at 586 (internal quotes omitted).  *Gupta* absolutely precludes the plaintiff from establishing a genuine issue of material fact as to whether Griggs' harassment was severe or pervasive and dictates that her claim of sexual harassment fail as a matter of law.[17]

## II.  Title VII Retaliation.

"It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

---

[17] Because the plaintiff has no viable claim of sexual harassment, the Court pretermits discussion of the defendant's argument that it cannot be held liable for any such harassment.

this subchapter."  42 U.S.C. § 2000e-3(a).  The plaintiff alleges retaliation under both the "opposition" and the "participation" prongs of this statute.

In opposition to the defendant's motion, the plaintiff has submitted the following list of the defendant's allegedly retaliatory conduct:

- Refusal to change her job title to activity coordinator, May 2010
- Written warning, August 6, 2010
- Performance improvement plan ("PIP"), August 12, 2010
- Computer desk incident, August 19, 2010
- Suspension, October 8, 2010
- Written warning, October 20, 2010
- Being forced to sign a document with incorrect job title, October 20, 2010
- Being told not to write grievances on company time, November 2, 2010
- Written warning, December 6, 2010
- PIP extension, December 6, 2010
- Suspension, December 7, 2010
- Written warning, December 20, 2010
- Written warning and suspension, January 3, 2011
- Confiscation of the plaintiff's keys, April 1, 2011
- Written warning and suspension, April 15, 2011
- Hiding paperwork and other work materials, April 2011
- Termination, April 29, 2011

(Doc. 75, Plaintiff's Exhibit K).  The amended complaint identifies demoting the plaintiff and denying her vacation requests as additional instances of retaliatory conduct.  (Doc. 22 at 8).  As the defendant addresses these latter instances without claiming they are barred by the plaintiff's failure to include them in her current listing, (Doc. 64 at 33-35), the Court deems them still part of the case.

**A. Opposition Clause.**

The plaintiff has also provided a list of her asserted acts of internal opposition, as follows:  (1) verbal and written reports of sexual harassment against Lawrence, delivered to management in early April 2010; (2) verbal objection to retaliation, delivered to Griggs on August 19, 2010; (3) verbal objection to retaliation, delivered to McFeely on or about October 20, 2010; (4) written complaint of retaliation and sexual harassment, delivered to McFeely and Harrison on or about November 2, 2010; (5) written complaint of retaliation, delivered to McFeely and Harrison on or about April 18, 2011; and (6) written complaint of retaliation, delivered to McFeely, Harrison and Roberts on or about April 25, 2011.  (Doc. 75, Plaintiff's Exhibit K).[18]

Similar to discrimination cases, a retaliation case not based on direct evidence follows a burden-shifting format.  First, the plaintiff must make out a prima facie case.  Second, the defendant must produce evidence of legitimate, non-retaliatory reasons for the plaintiff's adverse treatment.  Third, the plaintiff must show that the defendant's proffered reasons are a pretext for prohibited retaliatory conduct.  *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  The defendant addresses all three steps.

**1. Prima facie case.**

"A prima facie case of retaliation under Title VII requires the plaintiff to show that:  (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity

---

[18] The plaintiff's listing includes as "protected activity" several instances of her superiors learning of or discussing her acts of opposition.  The conduct of third parties obviously cannot constitute protected activity by the plaintiff.  *See Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (rejecting as "utterly implausible" the "suggestion that the *EEOC*'s issuance of a right-to-letter – an action in which the employee takes no part – is a protected activity of the employee") (emphasis in original).

and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  The defendant challenges the plaintiff's ability to establish each of these elements.

### a. Protected activity.

While Section 2000e-3(a) indicates that the "activity protected under Title VII" is opposing "an unlawful employment practice," the plaintiff need not show that she opposed conduct which actually violated Title VII.  However, she must demonstrate both that she in good faith believed the conduct violated that statute and that her belief was "objectively reasonable in light of the facts and record presented."  *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1213 (11th Cir. 2008) (internal quotes omitted).  The defendant focuses on the objective prong of the test.

"[T]he reasonableness of [a plaintiff's] belief that [the defendant] engaged in an unlawful employment practice must be measured against existing substantive law." *Howard v. Walgreen Co*., 605 F.3d 1239, 1244 (11th Cir. 2010) (internal quotes omitted). That is, an otherwise unreasonable belief that the defendant's conduct was unlawful is not rendered reasonable by the plaintiff's "ignorance of the substantive law."  *Weeks v. Harden Manufacturing Corp*., 291 F.3d 1307, 1317 (11th Cir. 2002).

As the discussion in Part I.C reflects, the cases cited therein render patently unreasonable any subjective belief the plaintiff may have possessed that the single incident concerning Lawrence which she reported to management in April 2010 amounted to actionable sexual harassment.  The plaintiff therefore cannot pursue a claim of retaliation based on her submission of that complaint.

The same is true with respect to the plaintiff's November 2010 complaint of sexual harassment against herself.  Eleventh Circuit precedent in existence at that time, especially *Mendoza* and *Gupta*, established directly that most of Griggs' conduct towards the plaintiff was not severe and established by extrapolation and citation to other appellate authorities that the rest was not severe, either.  Extant Eleventh Circuit cases

[22]

also made clear that the plaintiff had not been subject to frequent harassment and that most of Griggs' conduct could not even arguably be construed as threatening or intimidating.  The plaintiff's own evidence demonstrated the absence of any adverse effect on her work performance, and Eleventh Circuit precedent reflected that no reasonable person's performance would have been impaired.  Finally, *Gupta* unmistakably confirmed that the cumulation of these meager circumstances could not possibly raise the plaintiff's case anywhere near the actionable level.

Moreover, the plaintiff's complaint to the defendant did not include all the incidents on which her lawsuit is based.  She did not complain to management that Griggs stared at her, or that Griggs sought to attend basketball games in Atlanta with her, or that Griggs touched her in the elevator, or that Griggs, when "too close and personal," got in her face.  (Defendant's Exhibit 23 at 12-14)  It is thus even more obvious that, in light of her evidence and existing substantive law, the plaintiff's internal complaint could not support an objectively reasonable belief that Griggs' conduct amounted to actionable sexual harassment.  Accordingly, the plaintiff cannot pursue a claim of retaliation based on her submission of a written complaint of sexual harassment in November 2010.[19]

The balance of the November 2010 document, and the entirety of the other four claimed instances of opposition, objected only to retaliation, not to sexual harassment.  Both the amended complaint and the plaintiff's brief assert that the defendant retaliated against the plaintiff for opposing previous retaliation against her.  (Doc. 22 at 8; Doc. 73 at 45).[20]  In seeking dismissal of the plaintiff's retaliation claim for want of protected activity, however, the defendant relies exclusively on its discussion of the weakness of

---

[19] To the uncertain extent the plaintiff relies on what she told Harrison in December 2010 when he investigated her November 2010 written complaint – essentially, a regurgitation of the writing, (Doc. 73 at 18) – the same result obtains.

[20] Since retaliation is itself made an unlawful employment practice by Section 2000e-3(a), opposition to retaliation presumably is protected under that provision.  The defendant makes no argument to the contrary.

the plaintiff's claim of sexual harassment.  (Doc. 64 at 33).[21]  Having ignored the plaintiff's opposition to retaliation, the defendant cannot obtain dismissal of these portions of her claim on this ground.

### b. Adverse employment action.

The Eleventh Circuit continues to employ the term "adverse employment action" in the retaliation context,[22] but it no longer carries the restrictive definition that obtains in the discrimination setting.  In particular, "the anti-retaliation provision, unlike the substantive provision, is not limited to ... actions that affect the terms and conditions of employment."  *Burlington Northern and Santa Fe Railway v. White*, 548 U.S. 53, 64 (2006).  Instead, the test is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 68 (internal quotes omitted).  While "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence," *id*. at 68, *Burlington Northern* "strongly suggests that is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions."  *Crawford*, 529 F.3d at 974 n.13.

The defendant posits that the denial of vacation requests, the receipt of PIPs, the receipt of write-ups for attendance issues, "etc." do not attain the *Burlington Northern* standard.  (Doc. 64 at 33-34).  It offers this bald conclusion without any analysis, citation to authority, or acknowledgment of the quoted excerpt from *Crawford*.  Nor does the

---

[21] In its reply brief, the defendant for the first time argues that the plaintiff's August 19 communication to Griggs does not constitute protected activity.  (Doc. 83 at 21-22).  For reasons set forth previously, *see* note 8, *supra*, the argument is raised too late to be considered.

[22] *E.g., Dixon v. The Hallmark Companies., Inc.*, 627 F.3d 849, 856 (11th Cir. 2010).

defendant address the general principle that actions not individually constituting an adverse employment action for purposes of a retaliation claim may do so when "considered collectively." *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1118 (11th Cir. 2001)). The Court will not attempt to support the defendant's conclusory position when it has elected not to do so. Accordingly, the defendant cannot obtain dismissal of the opposition-clause claim on this ground.

### c. Causal connection.

Of the wealth of alleged retaliatory actions listed above, the defendant challenges the plaintiff's ability to establish the causation element of her prima facie case with respect to only two of them: her demotion and her October 8 suspension. (Doc. 64 at 34).

### i. Demotion.

The plaintiff understood that she had been hired as an activity coordinator. In December 2009, Griggs presented the plaintiff a performance review identifying her as an activity assistant. The plaintiff objected that Griggs' action resulted in her being subject to a lower salary cap, and she refused to sign the evaluation. The defendant correctly notes that, because this incident preceded the plaintiff's earliest protected activity on August 19, 2010, there could not possibly be a causal connection between the refusal and the protected activity. The defendant is entitled to dismissal of the plaintiff's retaliation claim to the extent based on her alleged demotion.[23]

---

[23] The same is necessarily true with respect to the defendant's refusal to correct the plaintiff's job title in May 2010, the written warning of August 6, 2010, and the PIP of August 12, 2010. The defendant is likewise entitled to dismissal of the plaintiff's retaliation claim to the extent based on this conduct.

### ii.  October 8 suspension.

The defendant first argues the October 8 suspension was too remote from the plaintiff's April report of sexual harassment against Lawrence to reflect causation.  (Doc. 64 at 34).  The defendant's argument is sound so far as it goes.  "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  However, "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."  *Id.*[24]

The defendant's error is in omitting consideration of the plaintiff's August 19 complaint of retaliation directly to Griggs.  From August 19 to October 8 is 50 days, and the Eleventh Circuit has considered 52 days to be sufficient temporal proximity to satisfy the causation element of the prima facie case.  *Farley v. Nationwide Mutual*, 197 F.3d 1332, 1337 (11th Cir. 1999).  Without addressing *Farley*, the defendant cannot obtain dismissal for want of close temporal proximity.[25]

The defendant next argues that it was Roberts, not Griggs, who suspended the plaintiff, and the defendant suggests that Roberts was unaware of the plaintiff's opposition to protected activity.  (Doc. 64 at 34-35).  *See, e.g., Gupta*, 212 F.3d at 590 ("To establish a causal connection, a plaintiff must show that the decisionmakers were

---

[24] A*ccord Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between [the protected expression and the adverse action] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (a gap of four months is too long to constitute close temporal proximity).

[25] The defendant relies on *Williams v. Waste Management, Inc*., 411 Fed. Appx. 226 (11th Cir. 2011), for the proposition that two months is too long to constitute close temporal proximity for purposes of the prima facie case.  Fifty days is, of course, almost two weeks shorter than two months, so *Williams* does not answer the question.  Moreover, *Williams* is an unpublished opinion, which decisions "are not controlling authority and are persuasive only insofar as their legal analysis warrants."  *Bonilla v. Baker Concrete Construction, Inc*., 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).  Since *Williams* neither cited *Farley* (or any case other than *Thomas*) nor explained its contrary result, the Court does not find *Williams* persuasive.

aware of the protected conduct ….” ).  The defendant cites evidence that Roberts signed the suspension form but no evidence that Roberts was unaware of the plaintiff's internal complaint to Griggs.  The defendant thus cannot obtain dismissal on this ground.

Finally, the defendant stresses the plaintiff's admission that Roberts had no personal retaliatory animus towards her.  (Doc. 64 at 34-35).  In response, the plaintiff points to her testimony that Roberts suspended her for hollering at Griggs after receiving a false report from Griggs to that effect.  (Doc. 73 at 12-13; Jones I Deposition at 247-48).[26]

In certain narrow circumstances, it is permissible to impute the discriminatory animus of an employee (here, that of Griggs) to a neutral decision-maker (here, Roberts).  Under a "cat's paw" theory, "causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation [of the employee] without independently investigating the complaint against the employee."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *accord Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).  The plaintiff has offered evidence that Griggs presented Roberts with false information, but she has not identified evidence either that Griggs recommended that she be disciplined or that Roberts failed to conduct her own investigation before deciding on suspension.  Griggs' retaliatory animus thus cannot be imputed to Roberts.  The defendant is entitled to dismissal of the plaintiff's retaliation claim to the extent based on the October 8 suspension.

_____

[26] At least some of the plaintiff's testimony concerning Roberts' receipt and acceptance of false information from Griggs appears to be hearsay, but the defendant has not sought exclusion of the evidence on that ground.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the  material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Moreover, for all the Court can tell, the apparently hearsay portions of this evidence could be reduced to admissible form at trial.  Finally, the plaintiff's evidence includes alleged statements to the plaintiff by Roberts concerning the information and sources on which she relied in suspending the plaintiff, which may not be hearsay at all.  *See* Fed. R. Evid. 801(d)(2).  For these reasons, the Court considers the plaintiff's evidence.

### 2.  Legitimate, non-retaliatory reasons.

The defendant presents legitimate, non-retaliatory reasons for only four of its allegedly retaliatory actions.  (Doc. 64 at 35).  Three of these actions[27] have already been eliminated from the plaintiff's retaliation claim.  As to the fourth, the defendant states that the plaintiff's vacation requests were denied because they "were not properly submitted."  (*Id.*).

To meet its intermediate burden, the defendant must articulate a reason "legally sufficient" to justify judgment in its favor and must support the articulated reason "through the introduction of admissible evidence."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981); *accord Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998) (the defendant "must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision").  The defendant points to no evidence that the requests were not properly submitted, nor to evidence that the decisionmaker denied the requests on that basis.  The defendant therefore has not carried its intermediate burden.[28]

### 3.  Pretext.

"The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct" but "were a pretext for discrimination."  *Crawford*, 529 F.3d at 976 (internal quotes omitted).  The plaintiff's burden is to "demonstrate weaknesses or implausibilities in the

---

[27] They are the December 2009 demotion, the August 6, 2010 written warning, and the October 8, 2010 suspension.

[28] Neither side identifies when the denials of vacation requests occurred, so the Court cannot determine whether any or all such instances preceded August 19, 2010.

proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1279 (11th Cir. 2008).  Of course, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys Customer Management Group Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (internal quotes omitted).  To make this showing, the plaintiff may resort to "all the evidence," *Crawford*, 529 F.3d at 976, including "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 143 (2000).

Because the defendant offered reasons for only four of its actions, because three of those actions are subject to dismissal on other grounds, and because the defendant did not meet its intermediate burden as to the fourth, no discussion of pretext is in order.

### 4. Summary.

The defendant's motion for summary judgment as to the plaintiff's opposition-clause claim of retaliation is due to be granted in part.  First, the plaintiff cannot pursue this claim based on her opposition to sexual harassment but only with respect to her opposition to retaliation.  Second, the plaintiff cannot pursue this claim with respect to allegedly retaliatory conduct that preceded August 19, 2010, which conduct includes her December 2009 demotion, the May 2010 refusal to restore her job title, her August 2010 written warning, and her August 2010 PIP.  Third, the plaintiff cannot pursue this claim with respect to her October 8, 2010 suspension, since she is unable to create a genuine issue of material fact as to causation.

The defendant's motion must be otherwise denied.  The plaintiff's claim based on opposition to retaliation against her remains intact with respect to the denial of her vacation requests, because the defendant inadequately addressed this aspect of her claim.  Her claim remains intact with respect to the August 19, 2010 computer desk incident and

[29]

all conduct following the October 8, 2010 suspension, as the defendant did not address this conduct at all.[29]

## B.  Participation Clause.

The plaintiff's protected activity under the participation clause is the filing of an EEOC charge and the filing of this lawsuit.  The defendant concedes that this activity is protected under Section 2000e-3(a).  (Doc. 64 at 35-36).  The defendant also concedes that suspending and terminating an employee are adverse employment actions for purposes of a retaliation claim.  (*Id*. at 36).  The defendant is silent as to the other conduct the plaintiff claims to be retaliatory, so for purposes of the pending motion the Court assumes that all such conduct is potentially actionable under Section 2000e-3(a).  The defendant's only challenge to the plaintiff's ability to establish a prima facie case of retaliation under the participation clause is its argument that there is no causal connection between her termination or her three suspensions and her filing of a charge or lawsuit.  (*Id*. at 36-38).

### 1.  Prima facie case.

The defendant, without challenge by the plaintiff, identifies McFeely as the decisionmaker with respect to the plaintiff's termination and suspensions.  In order to establish a prima facie case of causation, the plaintiff must show that the decisionmaker, at the time he made the challenged decision, was aware of the plaintiff's protected conduct.  *E.g., McCann*, 526 F.3d at 1376.  The defendant assumes for argument that

---

[29] The defendant's silence appears to reflect in part an assumption that, once the participation clause is triggered (as it was in November 2010), subsequent acts of retaliation can be pursued only under that clause and not under the opposition clause.  While there may or may not be good reason to proceed under the opposition clause once the participation clause is triggered, the Court has been provided no authority that it is legally impossible to do so.

McFeely was aware of the plaintiff's protected activity when he made each of his challenged decisions, (Doc. 64 at 36), so the Court indulges the same assumption.

As discussed in Part I.A, the plaintiff filed an intake questionnaire with the EEOC on or about November 3, 2010.  The EEOC sent the defendant a notice of charge, with no charge attached, on or about November 19, 2010, which Harrison received sometime later in November.  (Harrison Deposition at 122-23; Defendant's Exhibit 54).

The EEOC sent the defendant a second notice of charge, with the charge attached, on or about December 8, 2010.  (Defendant's Exhibit 55).  Harrison received the second notice and charge on December 13, 2010 and promptly shared it with McFeely. (Harrison Deposition at 121; McFeely Deposition, Exhibit 11).

The plaintiff filed the instant lawsuit on March 15, 2011.  The defendant's agent for service of process received the complaint on March 23, 2011.  Harrison was advised of the lawsuit shortly thereafter and subsequently shared this information with McFeely. (Harrison Deposition at 190; *id.*, Exhibit 7).

The plaintiff was suspended on December 7, 2010, approximately two weeks after McFeely received notice of her charge.  She was suspended again on January 3, 2011, approximately six weeks after McFeely received notice of her charge and approximately two weeks after he reviewed the charge itself.  She was suspended a third time on April 15, 2011, approximately two weeks after McFeely became aware of her complaint.  She was terminated on April 29, 2011, approximately four weeks after McFeely became aware of her complaint.  Each of these periods falls well within the 52-day period the *Farley* Court held to be sufficiently short to meet the plaintiff's burden on his prima facie case.[30]  The defendant nevertheless argues that the plaintiff cannot establish a prima facie case of causal connection.  (Doc. 64 at 36-38).

_____

[30] 197 F.3d at 1337 ("The charge was made May 19, 1995 and Farley was fired seven weeks later on July 10, 1995.  We find this timeframe sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case."); *see also Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600, 601 (11th Cir. 1986) (where the plaintiff was terminated one month after (Continued)

In support, the defendant cites two unpublished decisions for the proposition that, no matter how close the temporal proximity between the protected activity and the adverse action, an "intervening act of misconduct" does, or at least can, break the causal connection and prevent the plaintiff from establishing a prima facie case. *See Henderson v. FedEx Express*, 442 Fed. Appx. 502, 506 (11th Cir. 2011); *Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx. 513, 521 (11th Cir. 2007). As noted previously, *see* note 25, *supra*, unpublished opinions are not binding and are persuasive only to the extent their legal analysis warrants. The Court does not find *Henderson* and *Hankins* persuasive and thus declines to follow them.[31]

The *Hankins* Court acknowledged *Farley* but stated that "close temporal proximity, without more, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." 237 Fed. Appx. at 520. The Eleventh Circuit has clearly stated, however, that "temporal proximity *alone* is sufficient to establish an inference of retaliation" when that proximity is "very close." *Brown v. Alabama Department of Transportation*, 597 F.3d 1160, 1182 (11th Cir. 2010) (emphasis added); *accord Thomas*, 506 F.3d at 1364. *Farley* held that seven weeks constitutes a "close temporal proximity" for purposes of this rule, and it required no additional evidence of causation. 197 F.3d at 1337. Contrary to *Hankins*, under these and other published cases a close temporal proximity "without more" is indeed sufficient to establish a prima facie case of causation.

The *Hankins* Court relied for its contrary conclusion on *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980), and on *Fleming v. Boeing Company*, 120 F.3d 242 (11th Cir. 1997). The *Whatley* Court did not address the

---

filing a charge, "[t]he short period of time, however, belies any assertion by the defendant that the plaintiff failed to prove causation").

[31] The trial court decisions to which the defendant cites are even less persuasive.

adequacy of the plaintiff's prima facie case or mention anything about "temporal proximity."  Instead, it upheld the trial court's ruling for the defendant – after trial, not on motion for summary judgment – on the grounds that the defendant "was able to articulate valid business reasons for the dismissal that were not pretextual."  *Id.* at 1328-29.

In *Fleming*, the Court upheld summary judgment for the defendant, on the grounds that the plaintiff had not established a prima facie case of causation.  The *Hankins* Court stated that the *Fleming* Court so ruled because, even though the plaintiff's protected activity occurred "shortly before the employer rejected her application for employment," the plaintiff's failure of a required typing test rendered her unqualified for the position.  237 Fed. Appx. at 520.  The *Fleming* Court did not address the "close temporal proximity" test, and it had no need to do so, since the plaintiff's admitted lack of an admitted minimum qualification for the position of itself precluded her from establishing causation.  Nor is there any indication that the plaintiff requested the Court to resolve the causation issue in her favor based on temporal proximity.  Moreover, *Fleming* did not involve intervening misconduct but, as noted, a lack of minimal qualification.  Finally, the *Fleming* opinion does not state that the plaintiff's application was *rejected* shortly after her complaint of sexual harassment but only that it was *submitted* shortly thereafter; for aught that appears, the adverse action occurred two or three months after the protected activity,[32] which would render successful resort to the temporal proximity test problematic if not impossible.

The *Henderson* Court's pronouncement was arguably dicta, since the Court ruled there was no evidence the decisionmakers were aware of the plaintiff's protected conduct when they terminated him two weeks later.  442 Fed. Appx. at 507.  The *Henderson* panel did not cite *Hankins*, but it did rely on *Fleming*, with a similar lack of persuasiveness.  *Id.* at 506.  The only other authority on which it relied is *Kiel v. Select*

---

[32] The plaintiff complained of sexual harassment in August and left the defendant's employment on November 8.  120 F.3d at 247.

*Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999) (en banc), which stated that the plaintiff's "intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination." *Id.* at 1136.  In the Eighth Circuit, however, unlike the Eleventh Circuit, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Id.*[33]  Because the Eleventh Circuit does not accept the Eighth Circuit's position, at least when the gap between protected activity and adverse action is less than two months, *Henderson*'s reliance on *Kiel* is unpersuasive.

At the prima facie case stage, the plaintiff "need only establish that the protected activity and the adverse action were not wholly unrelated."  *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999) (internal quotes omitted).  It is an initial screening process only, which does not require the plaintiff to definitively establish causation.  The *Hankins-Henderson* approach appears to go well beyond the purpose of the prima facie case.

It is also worth considering the practical utility of a rule that would allow intervening misconduct to break the causal connection established by close temporal proximity for purposes of establishing a prima facie case.  Such misconduct would of course provide a legitimate non-retaliatory reason for the employment action, requiring the plaintiff to offer adequate evidence of pretext in order to avoid summary judgment.  Under the rule espoused by *Hankins* and *Henderson*, a court reviewing a motion for summary judgment would simply consider at the initial, prima facie case stage the identical evidence it would otherwise consider at the second and third stages, with no change in result and no obvious gain in efficiency.

---

[33] In *Nelson v. J.C. Penney Co.*, 75 F.3d 343 (8th Cir. 1996), for example, on which the *Kiel* Court relied for this proposition, a mere one-month gap was inadequate evidence of causation when the plaintiff had been given a final warning before his complaint  and the plaintiff failed to present evidence that other complainers were also fired or that the decisionmakers discussed the complaint with each other or with the plaintiff.  *Id.* at 346.

For all these reasons, the Court rejects the defendant's argument that intervening misconduct severs the prima facie showing of causal connection made by a sufficiently brief interval between protected activity and the adverse employment action.  Because the intervals shown by the evidence here fall well within the range the Eleventh Circuit deems sufficiently narrow to satisfy the demands of a prima facie case, the defendant is not entitled to dismissal of any portion of the plaintiff's participation-clause claim of retaliation for want of causal connection.[34]

### 2.  Legitimate, non-retaliatory reasons.

The defendant articulates reasons for all of the listed retaliatory actions other than confiscation of the plaintiff's keys and hiding paperwork and other work materials.  As to the December 6 written warning and PIP extension, the defendant asserts excess tardiness; as to the December 7 suspension, refusal to sign the PIP; as to the December 20 written warning, failure to carry out a pizza party; as to the January 3 written warning and suspension, failure to carry out a patient outing; and as to the April 15 written warning and suspension, failure to report to work on her scheduled weekend.  (Doc. 64 at 38).  As to her termination, the defendant relies on "three separately valid reasons," consisting of the conduct underlying the suspensions of December 7, January 3 and April 15.  (*Id.*; Doc. 83 at 25).

Each of these reasons is legally sufficient to justify judgment in the defendant's favor, and the defendant has presented evidence that these were its actual reasons for

---

[34] The Court also notes that the defendant's argument specifies no misconduct occurring between the defendant's receipt of the notice of charge and the December 7, 2010 suspension. (Doc. 64 at 38).  And, as discussed in Part II.B.3, the plaintiff has submitted sufficient evidence of pretext with respect to the January and April suspensions, and the April termination, that the defendant could not establish its entitlement to summary judgment under the *Hankins-Henderson* standard even if it were applied.

each challenged employment decision.[35]  The burden thus shifts to the plaintiff to identify sufficient evidence that these reasons are a pretext for retaliation.

### 3. Pretext.

#### i.  December 6 written warning and PIP.

As to these the plaintiff is silent.  (Doc. 73 at 48).  The defendant is thus entitled to dismissal of this portion of the plaintiff's participation-clause retaliation claim.

#### ii.  December 7 suspension.

The plaintiff concedes her refusal to sign the PIP and McFeely's awareness of the refusal (since he witnessed it).  (Defendant's Exhibit 32).  Her only response is that "Mercy employees are not required to sign PIPS."  (Doc. 73 at 48).  Harrison's testimony on which she relies is actually only that signature is not "necessarily absolutely" required, and his answer continues that "[w]e obviously want to be able to show that you had reviewed that, again, with the individual."  (Harrison Deposition at 143).  The plaintiff has no evidence that company policy precludes discipline for refusal to sign and no evidence that other employees have escaped discipline for such refusals.  Finally, the plaintiff admits that, on October 20, 2010, McFeely directed her to sign a document, over her objection that it bore what she considered to be the incorrect job title of activity assistant, on pain of dismissal.  (Jones I Deposition at 260).  Since the plaintiff identifies no evidence that McFeely was then aware of the plaintiff's August 19 complaint to

---

[35] The plaintiff argues that the defendant's reasons have been presented in too conclusory a fashion to be considered legally sufficient.  (Doc. 73 at 48 n.30).  On the contrary, the contemporaneous discipline forms and memoranda are quite specific as to the bases of the defendant's actions.  It is not necessary that they include all the evidence on which the defendant relied in determining that the infractions occurred and that the discipline administered was appropriate.

Griggs,[36] his conduct on October 20 reflects his strict demand for signatures from those not known to have complained of retaliation.[37]  The defendant is entitled to dismissal of this portion of the plaintiff's claim.

### iii.  December 20 written warning.

The plaintiff was written up for failure to conduct the monthly pizza party the preceding Friday.  (Defendant's Exhibit 34).  She concedes she was responsible for the party and that the pizza did not arrive.  Her arguments in favor of pretext are:  (1) the lack of pizzas was Griggs' fault, not hers; and (2) Griggs had similarly failed to provide an earlier pizza party yet had not been disciplined.  (Doc. 73 at 48, 50).  As discussed below, the defendant is entitled to dismissal of this portion of the plaintiff's claim.

The plaintiff has presented evidence that it was Griggs' responsibility to order the pizzas, that she requested Griggs to do so on the morning of the party, and that Griggs later told her she had forgotten to do so.  (Doc. 73 at 19 and evidence cited therein).  However, she has presented no evidence that she informed McFeely of these matters.  She does not claim to have mentioned these things to McFeely on December 20, when he called her in to discuss the situation.  Instead, she claims to have done so in writing several days after December 20.  That document, however, is not addressed to McFeely and, while she cites testimony from Roberts and Harrison that they were aware of the writing, she cites none that McFeely was aware.  (*Id.*).

---

[36] October 20 was McFeely's third day of employment with the defendant.  (McFeely Deposition, Exhibit 1).  Harrison and Roberts had told McFeely about the plaintiff's (unprotected) complaint concerning Lawrence and about "friction" between the plaintiff and Griggs, but not about the plaintiff's complaint to Griggs.  (Doc. 73 at 13 and evidence cited therein).

[37] The plaintiff responded to McFeely's demand by calling it retaliation.  (Jones I Deposition at 262-63).  By this time, however, McFeely had already made the demand, (*id.*), without awareness of any complaint of retaliation.

[37]

The plaintiff has presented evidence that, sometime in early 2010, Griggs failed to order the pizza for the pizza party.  (Doc. 73 at 19 n.17 and evidence cited therein).  The plaintiff argues that Harrison was put on notice of this failure by Lawrence's April 2010 written complaint, submitted to management in follow-up to the plaintiff's verbal notice of Lawrence's claim of sexual harassment.  (*Id*. at 48).  What that document actually says is, "[Griggs] was unable to facilitate supervision of pizza party dietary requirements and blamed Mel, the social worker when it was truly a recreation therapy matter."  (Lawrence Deposition, Exhibit 2 at 4).  This obscure sentence, which does not mention a failure to order pizza or a resulting failure to have a pizza party, was wholly inadequate to trigger an investigation, especially as it was buried in an avalanche of allegations against Griggs, some much more serious.  In addition, McFeely was not employed by the defendant at the time and had no part in any conscious decision not to investigate the pizza incident.

### iv.  January 3 written warning and suspension.

The plaintiff received a  written warning and suspension after a patient outing for which the plaintiff was responsible did not occur.  (Defendant's Exhibit 35).  The plaintiff has presented evidence that the outing was canceled when three of the four patients scheduled to go on the outing decided at the last moment not to go, that the defendant discouraged outings for a single patient, that the plaintiff was unable to obtain alternates to go in place of those originally scheduled, and that Griggs stated she would therefore reschedule the event.  (Doc. 73 at 19-20 and evidence cited therein).  In contrast with the December 20 written warning, the plaintiff has presented evidence that she advised McFeely of these facts before he suspended her.  (*Id*.).

According to McFeely, the outing was canceled because the plaintiff failed to arrange transportation for it.  (McFeely Deposition at 142, 155).  Given the plaintiff's contrary testimony, on motion for summary judgment the Court cannot credit McFeely's version.  The defendant nevertheless argues that the mere fact McFeely so testified precludes the plaintiff from surviving summary judgment unless the record supports the

[38]

proposition that McFeely did not really believe this was the reason the trip was canceled. (Doc. 83 at 23-24).

There is ample reason to question whether McFeely truly believed that the plaintiff had failed to arrange transportation. First, McFeely offered this explanation "[o]ff the top of [his] head," (McFeely Deposition at 142), which does not instill confidence. Second, there is no indication in the record to which the Court has been cited that anyone ever told McFeely that the plaintiff had failed to procure transportation; indeed, there is no evidence of any kind to support a belief that she failed to do so.[38] Third, there is a similar lack of indication that McFeely conducted any investigation whatsoever before pronouncing judgment. Fourth, there is the plaintiff's evidence that she presented him a different explanation. While McFeely was not required to accept the plaintiff's explanation, his rejection of it in favor of an inculpatory explanation for which he had no support indicates he did not believe his explanation. The circumstances described are indicative of pretext.

On April 25, 2011, the plaintiff reported to McFeely that a patient outing for which Griggs was responsible had been canceled because the driver was not available after lunchtime. (Griggs Deposition, Exhibit 35). Because Griggs was not disciplined, the plaintiff cites this disparity in treatment as evidence of pretext. (Doc. 73 at 49). The defendant concedes that McFeely was made aware of this episode and that he did not discipline Griggs, but it argues the disparity in treatment is not evidence of pretext "because McFeely's inquiries determined that the trip was cancelled because of the driver's unexpected unavailability, and that Griggs was not at fault." (Doc. 83 at 24). The evidence to which the defendant cites, however, does not reflect an "unexpected" unavailability. Instead, it shows that the driver worked part-time and was off some

---

[38] The defendant cites to the deposition of Roberts, but her ambiguous testimony must, on motion for summary judgment, be construed as stating that McFeely told her the plaintiff had failed to procure transportation, not vice versa. (Roberts Deposition at 110-11).

afternoons, including the day Griggs scheduled the outing.  (McFeely Deposition at 183-84).  Griggs thus scheduled the outing without transportation available, which McFeely concedes is incorrect procedure.  (*Id*. at 182-83; Griggs Deposition, Exhibit 35).  The defendant has not, and could not easily, argue that there is a meaningful difference between failing to schedule transportation for an outing (as the plaintiff allegedly did) and scheduling an outing without transportation available (as Griggs apparently did).  Even assuming, as does the defendant, that Griggs' conduct must be "nearly identical" to the plaintiff's before the disparity in treatment becomes indicative of pretext, that standard is achieved here.

"On summary judgment, we have written that the 'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."  *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1363 (11th Cir. 1999).  The record here supports both. Moreover, that the discipline was administered less than three weeks after McFeely received the plaintiff's charge further indicates that he harbored a retaliatory motive in suspending her.  *See Reeves*, 530 U.S. at 143 (to establish pretext, the plaintiff can rely on evidence establishing her prima facie case).  The sum is sufficient to create a genuine issue of fact as to whether the defendant's articulated reason for issuing the January 3 written warning and suspension is a pretext for unlawful retaliation against the plaintiff for filing a charge of discrimination.

### v.  April 15 written warning and suspension.

The plaintiff received a  written warning and suspension on April 15, 2011, after she failed to report to work as scheduled on Saturday, April 9.  (Defendant's Exhibit 72). The plaintiff has presented evidence that she regularly worked two other jobs on Saturdays; that, in three years of employment, the defendant had never scheduled her to work a Saturday or Sunday except on rare occasions when she requested it in order to

take time off during the regular workweek; that she learned of the schedule only on April 4, upon her return from FMLA leave; that she notified Griggs by e-mail on April 5 that she would be unable to work on April 9 due to the short notice; that this notice complied with a work rule requiring at least two hours advance notice of an inability to work a scheduled shift; that Griggs never responded; that Griggs forwarded the plaintiff's e-mail to McFeely and asked for direction; and that McFeely did not respond either to Griggs or to the plaintiff.  (Doc. 73 at 24-25 and evidence cited therein).

The defendant responds that the plaintiff was not disciplined for being unable to work but for refusing to work.  (Doc. 83 at 24).  The defendant identifies no evidence that McFeely considered the plaintiff's conduct to be based on refusal rather than inability, and the written warning describes it simply as a "failure."  (Defendant's Exhibit 72).

The defendant stresses that the plaintiff's conflict was due to outside employment and that it maintains a policy that "[o]ff-duty employment will not be considered an excuse for … absenteeism … or refusal to work … different hours."  (Defendant's Exhibit 39).  The defendant, however, identifies no evidence that McFeely was aware that the plaintiff's conflict on April 9 was due to outside employment; on the contrary, the defendant admits it first learned this at the plaintiff's deposition.  (Doc. 64 at 21-22; Doc. 83 at 24).

Finally, the defendant argues that the work rule requiring at least two hours advance notice applies only "to unexpected absences from illness, car trouble[,] etc."  (Doc. 83 at 25).  On its face, the policy to which the defendant cites contains no such restriction, and the defendant neither explains how such a limitation can be read into the provision nor identifies evidence that McFeely had and relied on such a construction of it.

The Court detects a wealth of material indicating that the defendant's articulated reason for disciplining the plaintiff on April 15 was a pretext for unlawful retaliation for filing this lawsuit.  Some of this evidence concerns matters preceding the episode itself.  First, the temporal proximity between McFeely's awareness of the complaint and his

[41]

imposition of discipline was very close, barely two weeks.[39]  Second, and as discussed in the preceding section, a jury could reasonably find that McFeely retaliated against the plaintiff in connection with her January written warning and suspension.[40]  Third, upon her return to work on April 1, McFeely came to the plaintiff and confiscated the keys she needed to access the supplies she used for patient activities and which she had previously retained, telling her she would not get them back.[41]  Because she had been on FMLA leave from January 7 through March 31, this was McFeely's first opportunity for official interaction with the plaintiff since suspending her on January 3, and he appears to have picked up where he left off.  Moreover, this was his first official contact with the plaintiff since he learned of her judicial complaint no more than a few days earlier.

Additional evidence of pretext surrounds the incident itself.  It appears to be uncontroverted that McFeely instituted weekend work in the recreation therapy department while the plaintiff was on FMLA leave and that Griggs herself had worked weekends during this period, so there is no indication that Saturday work was of itself retaliatory.  However, there is evidence that the plaintiff gave advance notice of her inability to work on April 9 in compliance with formal policy and that her announcement was met with silence, leading her to believe she was not required to attend, especially in light of the defendant's practice of providing ample advance notice of schedule changes[42]

---

[39] *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("The close temporal proximity between Hurlbert's [protected activity] and his termination – no more than two weeks, under the broadest reading of the facts – is evidence of pretext, though probably insufficient to establish pretext by itself.").

[40] "Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment ...."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

[41] The plaintiff identified this as an act of retaliation for filing her complaint, (Plaintiff's Exhibit K at 4), but the defendant has ignored it, leaving the plaintiff's version unrebutted.

[42] (Griggs Declaration, ¶ 29).

and McFeely's quickness to find fault with her.  Indeed, it is reasonable to infer that McFeely laid a trap for the plaintiff, since he knew in advance she would not attend on April 9 because she was unable to do so on short notice, yet he remained silent rather than advise her that failure to appear would result in discipline.  That his decision to remain silent occurred barely a week after he learned of the plaintiff's lawsuit only strengthens the inference.  That he had already formed a desire to terminate her employment does so as well.[43]

In sum, the record is sufficient to create a genuine issue of fact as to whether the defendant's articulated reason for issuing the April 15 written warning and suspension is a pretext for unlawful retaliation against the plaintiff for filing this lawsuit.

### vi.  April 29 termination.

McFeely terminated the plaintiff on April 29.  (Defendant's Exhibit 42).  The defendant identifies three reasons for the termination:  (1) the conduct surrounding the December 7 suspension; (2) the conduct surrounding the January 3 suspension; and (3) the conduct surrounding the April 15 suspension.  (Doc. 64 at 38; Doc. 83 at 25).  As noted above, a reasonable jury could find that the latter two suspensions were the product of unlawful retaliation.  It could thus reasonably find that the termination was likewise based on unlawful retaliation.[44]

---

[43] McFeely admits he wanted to fire the plaintiff once he learned she was working at another job while on FMLA leave.  (McFeely Deposition at 158-63).  The defendant suggests this desire disappeared as soon as Harrison told McFeely not to terminate the plaintiff for this reason, (Doc. 64 at 21), but a reasonable jury could find that a desire to fire the plaintiff continued unabated.  A reasonable jury could also find that his desire to fire the plaintiff sprang not only from the FMLA incident but also from her internal complaints of retaliation (since it could find that her January suspension was so motivated).

[44] While the defendant asserts that "each [incident] separately was a valid reason to terminate her employment," (Doc. 64 at 38), it did not in fact base termination solely on the December 7 incident.  Nor has it offered any evidence that it would have terminated the plaintiff on April 29 based solely on that incident.

[43]

### 4. Summary.

The defendant's motion for summary judgment as to the plaintiff's participation-clause claim of retaliation is due to be granted in part.  The plaintiff cannot pursue this claim with respect to allegedly retaliatory conduct preceding her January 3, 2011 written warning and suspension, since she lacks evidence that the defendant's articulated reasons for those actions are a pretext for unlawful retaliation against her for filing an EEOC charge.

The defendant's motion must be otherwise denied.  The plaintiff's retaliation claim under the participation clause remains intact with respect to the January 3 written warning and suspension, the April 15 written warning and suspension, and the April 29 termination because the plaintiff created a genuine issue of fact as to whether the defendant's articulated reasons for these actions are a pretext for unlawful retaliation.  The plaintiff's claim with respect to the confiscation of her keys and the hiding of her paperwork and other materials remains intact because the defendant did not address this conduct.

## III. FMLA Retaliation.

"It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  This language creates a cause of action for retaliation, "in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."  *Hurlbert v. St. Mary's Health Care System, Inc*., 439 F.3d 1286, 1293 (11th Cir. 2006) (internal quotes omitted).

There is evidence that, after she was given a three-day suspension on January 3, the plaintiff's physician recommended a leave of absence from work, resulting in FMLA leave from January 7 through March 31.  The plaintiff returned to work on April 1, was suspended on April 15, and was terminated on April 29.

[44]

### A.  Direct Evidence.

As under Title VII, a claim of FMLA retaliation can be made out by direct evidence.  *Schaaf v. Smithkline Beechum Corp*., 602 F.3d 1236, 1243 (11th Cir. 2010). The plaintiff argues that she has presented such evidence.  (Doc. 73 at 43-44).

The plaintiff continued to work at her second, weekend job at a dry cleaning establishment while on FMLA leave.  There is evidence that her physician cleared her to do so because it – unlike her job with the defendant – was not causing her physical and other problems.  At some point, McFeely noticed the plaintiff at the dry cleaners while he was on personal business nearby.  He entered the establishment and "told me I was not supposed to be working."  (Jones II Deposition at 36).  McFeely asked Harrison how the plaintiff could be on FMLA leave when she was capable of working at the dry cleaners, and he told Harrison he wanted to fire her.  (McFeely Deposition at 162-63).

Whether under a direct or a circumstantial evidence paradigm, the plaintiff must show that the defendant took the challenged action "because [s]he engaged in activity protected by the Act."  *Hurlbert*, 439 F.3d at 1293.  As the defendant concedes, (Doc. 64 at 35-36), taking FMLA leave is a right protected by the FMLA.  McFeely's statement could be direct evidence of an intent to retaliate against the plaintiff for taking FMLA leave only if its "intent could mean nothing other than to discriminate" on that basis, "without inference or presumption."  *Dixon v. The Hallmark Companies, Inc*., 627 F.3d 849, 854 (11th Cir. 2010) (internal quotes omitted).  But McFeely's comment could be construed as an intent to retaliate *either* for taking FMLA leave *or* for working a second job while on FMLA leave.  If the latter were also protected activity under the FMLA, the disjunctive would be immaterial, but the plaintiff has advanced no argument that the FMLA protects the right to work another job while on such leave, and the Court will not search for support for such a proposition on her behalf.  Because McFeely's comment reflects an intent to retaliate against the plaintiff for taking FMLA leave only by application of inference, it cannot constitute direct evidence.

[45]

### B.  Circumstantial Evidence.

Absent direct evidence, the traditional burden-shifting framework under Title VII applies to claims of FMLA retaliation.  *Schaaf*, 602 F.3d at 1243.  The three elements of the prima facie case are the same as they are under Title VII.  *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012).

#### 1.  Prima facie case.

The defendant presents no separate argument as to the plaintiff's FMLA claim; instead, it relies on its argument as to the Title VII participation-clause claim.  (Doc. 64 at 35-40; Doc. 83 at 20-26).  Thus, the defendant raises no argument that close temporal proximity between the protected activity and the adverse employment actions is lacking,[45] and its argument that "intervening misconduct" breaks the causal connection fails for reasons set forth in Part II.B.1.  The defendant therefore cannot obtain dismissal of this claim for want of a prima facie case.

#### 2.  Legitimate, non-retaliatory reasons.

The defendant's articulated reasons are the same as for the Title VII claim.  As to the April 15 written warning and suspension, the defendant relies on the plaintiff's failure to work on April 9.  As to the April 29 termination, it relies on the suspensions of December 7, January 3 and April 15.  (Doc. 64 at 38; Doc. 83 at 25).  For reasons given in Part II.B.2, these reasons are adequate to carry the defendant's burden.

---

[45] The defendant apparently assumes that close temporal proximity, when the protected conduct is the taking of FMLA leave, runs from the date the employee returns to work and not from the day the leave commenced or is requested.  The Eleventh Circuit has indulged a similar assumption.  *Schaaf*, 602 F.3d at 1240, 1243 (where the plaintiff began FMLA leave on January 21, returned to work on April 15, and almost immediately received a demand that she accept a demotion or leave the company, the Court assumed without deciding that the plaintiff had established a prima facie case because "her demotion was temporally proximate to her leave").

The defendant articulates no reason for confiscating the plaintiff's keys on April 1 or hiding her paperwork and other materials in April.  It therefore has not carried its burden as to these actions.

### 3.  Pretext.

The Court's previous discussion of pretext with respect to the April 15 discipline in the Title VII context applies almost completely in the FMLA context, with even the date of the plaintiff's return to work closely paralleling the date of McFeely's initial awareness of her judicial complaint.  The only indication of pretext that does not carry over is that the January 3 discipline could not be found to be an earlier instance of FMLA retaliation.  But that loss is fully offset by McFeely's expressed desire to terminate the plaintiff's employment.  While the statement is not direct evidence, it can reasonably be construed as reflecting a desire to retaliate against the plaintiff for taking FMLA leave.[46] In sum, the record is sufficient to create a genuine issue of fact as to whether the defendant's articulated reason for issuing the written warning and suspension is a pretext for unlawful retaliation against the plaintiff for taking FMLA leave.

As noted, the defendant relies on the three suspensions as its reasons for terminating the plaintiff.  Because a reasonable jury could find that the third suspension was in retaliation for the plaintiff's exercise of her FMLA rights, the termination is similarly tainted.  It might be that the first two suspensions would have justified termination without regard to the third, but there is evidence that McFeely developed the intent to discharge the plaintiff only when confronted with her use of FMLA leave and no evidence that he would have terminated her without the tainted April 15 suspension.

---

[46] *See, e.g., Bass*, 256 F.3d at 1105 (statements that do not constitute direct evidence may still be considered as circumstantial evidence).

**CONCLUSION**

For the reasons set forth above, the defendant's motion for summary judgment is **granted** as to the plaintiff's sexual harassment claim and **denied** as to her FMLA retaliation claim.  As to the plaintiff's Title VII retaliation claims under the opposition and participation clauses, the defendant's motion is **granted in part and denied in part** as set forth herein.

DONE and ORDERED this 11th day of June, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE